## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | |
|---|---|
| JASON W. SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:14CV98 RLW |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of Defendant's final decision denying Plaintiff's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. For the reasons set forth below, the Court affirms the decision of the Commissioner.

## I. Procedural History

On June 27, 2011, Plaintiff filed an application for DIB alleging disability beginning May 14, 2011 due to arthropathy, back injury, arthritis, pre-diabetes, depression, sleep apnea, high blood pressure, and high cholesterol. (Tr. 10, 68, 133-39) The application was denied, and Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). (Tr. 67-76) On April 15, 2013, Plaintiff testified at a hearing before the ALJ. (Tr. 33-56) On June 20, 2013, the ALJ determined that Plaintiff had not been under a disability from May 14, 2011 through the date of the decision. (Tr. 10-24) Plaintiff then filed a request for review, and on September 19, 2014, the Appeals Council denied Plaintiff's request. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the April 15, 2013 hearing before the ALJ, Plaintiff appeared and was represented by counsel. Plaintiff testified that he was 32 years old and married with two children. He weighed 225 pounds and measured 5 feet 9 inches. Plaintiff had lost 150 pounds after undergoing gastric bypass surgery. Plaintiff completed the 8th grade and did not receive a GED. He last worked in May of 2011 as a certified med aide ("CMA") at Hillside Care Center. Plaintiff stopped working due to back, knee, neck, and shoulder problems. His weight was also an issue. (Tr. 36-38)

Plaintiff had neck surgery on April 1, 2013. He stated that he underwent a cervical laminoplasty during which doctors cleaned up the nerve and took out bone spurs. However, he continued to experience pain in his neck on a daily basis. In addition, his arms and hands still went numb, with a tingling sensation. When Plaintiff moved his head, he felt pain going down his arms and into his back. The numbness and tingling were greater on the left than the right. Plaintiff was left handed and had trouble grasping a pen and writing. The numbness and tingling occurred five to six times a day and lasted for a minute or two. (Tr. 38-43)

Plaintiff further testified that he experienced back pain and stiffness. The pain was exacerbated by standing, lying down, or sitting too long, as well as lifting something too heavy. Plaintiff specified that he could stand for about 30 minutes before needing to sit down. After 30 minutes to an hour of sitting, he had to stand up. Plaintiff testified that he was always changing positons from lying down, standing, and lying in his recliner. He slept in a recliner because he woke up with pain and numbness when he slept in a bed. (Tr. 44-45)

With regard to his knees, Plaintiff stated that he had no cartilage in his left knee and very little cartilage in his right knee. Plaintiff's doctor told him that he needed knee replacement surgery but that he was too young. Plaintiff weighed 372 pounds before undergoing gastric

bypass surgery. He was later hospitalized in the psychiatric ward because he was depressed from his physical symptoms and from wanting, but being unable, to work. He stated the weight loss surgery backfired because he lost 150 pounds but then needed knee replacements. Plaintiff had also been sexually abused by his cousin. He was treated by Dr. Lyle Clark, a psychiatrist, and by Ben, a social worker. Plaintiff took Zoloft and Effexor for his depression. Plaintiff was unsure whether the medications helped, as he still had problems with mood swings and PTSD. He experienced bad dreams about his childhood, including the abuse from his cousin and terrible household conditions. In addition, Plaintiff did not trust his children to go to other people's homes except his in-laws. (Tr. 45-51)

A Vocational Expert ("VE") also testified at the hearing. The VE stated that Plantiff's past jobs included certified nurse's assistant, which was medium, semi-skilled work; a general factory laborer, which was medium, unskilled work; and a janitor, which was medium, semi-skilled work. The VE testified that some unskilled jobs at the sedentary level were more stressful than others. The lower stress jobs did not deal with the public, were not at a strict pace, and did not have strict high production demands. The ALJ then asked the VE to assume an individual with the same age, education, and work experience as Plaintiff. This person had the residual functional capacity ("RFC") for work at the sedentary level where he could only perform low stress work, meaning not working with the public or not performing a job with a strict high production demand. The other restriction was that the individual had limited range of motion in his neck. Given this RFC and additional limitations, the VE testified that the hypothetical individual could work as a sedentary hand assembler or sedentary machine tender. (Tr. 51-55)

Plaintiff's attorney added restrictions to the ALJ's hypothetical question and asked the VE to assume the person was limited to only occasional handling, fingering, feeling, and reaching with the dominant extremity. Further, the person could frequently use the non-dominant extremity. Given these restrictions, the VE testified that all of the jobs she identified and all lower stress sedentary jobs would be eliminated. Further, if the hypothetical individual required a sit/stand option to alternate at will in 20 to 25 minute intervals, there would be no jobs available. At the end of the hearing, the ALJ left the record open for 30 days for Plaintiff's attorney to obtain new records. (Tr. 55-56)

In a Function Report – Adult completed by Plaintiff on July 17, 2011, Plaintiff stated that on a typical day he got dressed, ate breakfast, watched TV, and ate lunch and dinner, lay down, showered, and went to bed. He sometimes helped his wife around the house. He watched his two children, fixed easy meals for them, and assisted them when they needed help. Plaintiff tossed and turned all night trying to be comfortable. He was able to make sandwiches, frozen dinners, and microwavable items three times a week. Plaintiff performed no house or yard work due to pain. He sat outside four times a day. Plaintiff could drive a car and go out alone, but he did not go shopping. His interests included reading, fishing, watching TV, playing sports, and wrestling with his boys. However, he could no longer do most of these things. He could read and watch TV only until he could no longer sit. He visited with his parents or in-laws either in person or on the phone. Plaintiff reported that his conditions affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, and complete tasks. He specified that he could only lift 5 pounds without pain; stand for a short time; walk only a block without pain; and sit for only a short time. He could walk a block but then needed to rest for 10 minutes or until his knee and back pain improved. He had some problems with paying attention and following

4

instructions. However, he was able to get along with authority figures and could handle a little stress and changes in a routine. (Tr. 189-96)

Plaintiff's wife, Ashley Smith, also completed a Function Report Adult – Third Party. Her report essentially mirrored her husband's report. Ms. Smith indicated that Plaintiff cleaned the table and counters for her and that she encouraged him to do a little bit each day. Plaintiff went outside a few times a day to watch the kids play. He drove his wife to the store and sat on a bench for about an hour while she shopped. Ms. Smith stated that Plaintiff's conditions affected his ability to lift, sit, stair climb, squat, kneel, bend, stand, reach, walk, and concentrate. He could only sit for 30 minutes before needing to get up and move, and he had difficulty using stairs. Plaintiff could maybe walk 2 blocks but then needed to rest for 10 minutes or until the pain subsided. He was okay with following instructions. In addition, Ms. Smith reported that Plaintiff became emotional with a lot of stress and moody with a little stress. He could handle small changes in routine. She stated that Plaintiff had become more withdrawn, moody, and temperamental. (Tr. 178-85)

In addition, Plaintiff's mother, Darlene Smith, completed a form indicating that Plaintiff had severe back pain, knee problems, arthritis, and neck pain such that he could only walk or stand 5 to 10 minutes before needing to sit down or sit 20 to 30 minutes before needing to stand up or lie down. She stated that Plaintiff required help putting on socks and shoes. He was stressed every day and had trouble understanding and remembering instructions. (Tr. 385-87)

Plaintiff's mother-in-law, Tammy Brokes, stated that Plaintiff was in constant pain and could not stand, walk, or sit for very long. He had trouble sleeping, and his legs shook when walking or sitting. Ms. Brokes observed that Plaintiff experienced pain based on his facial expression and mood. He constantly moved his body to get comfortable. She opined that

5

Plaintiff could lift 3 to 5 pounds with one hand and 5 to 10 pounds with both hands. In addition, Plaintiff had trouble putting on pants, shoes, and socks. He tried to help with household chores but was unable to due to pain. He had no difficulty interacting with the public. Ms. Brokes further stated that Plaintiff was stressed all the time because he could not work or play with his children. He had trouble remembering things when he experienced bad headaches. (Tr. 389-91)

## III. Medical Evidence

On May 15, 2011, Plaintiff presented to Hannibal Regional Hospital for complaints of back pain after moving furniture around the previous day. (Tr. 403-09) On May 18, 2011, Leslie A. McCoy, D.O., examined Plaintiff for low back pain. Dr. McCoy prescribed Flexeril and Vicodin and recommended physical therapy. (Tr. 314) Plaintiff attended an initial evaluation with physical therapy but did not show up for further appointments. (Tr. 368-74)

Plaintiff established care with Dr. Jeffry Evans on May 26, 2011. Plaintiff complained of depression, diabetes, hyperlipidemia, hypertension, and back pain with right radicular symptoms. Dr. Evans noted that Plaintiff's mood was good, and his other symptoms were controlled on medication. However, Plaintiff continued to experience back pain, which the Vicodin only temporarily dulled. Examination of Plaintiff's back revealed no real tenderness to palpation. Straight leg raising was positive on the right and negative on the left. Plaintiff had an antalgic gait. Dr. Evans assessed depression, diabetes, hyperlipidemia, hypertension, and back pain with right radiculopathy. He refilled Plaintiff's Vicodin prescription and planned to set up an MRI of Plaintiff's LS spine. The MRI showed impingement at L4-L5. Plaintiff acknowledged that his morbid obesity contributed to his back pain. (Tr. 307-12)

On June 21, 2011, Dr. C. Leann Boxerman examined Plaintiff for complaints of left knee pain. Plaintiff reported that his knee popped as he was getting into his car, and the knee wanted

6

to give out on him when he walked. Plaintiff was not in acute distress. Examination revealed minimal tenderness to any range of motion, no edema, and no ecchymosis. The x-ray showed mild degenerative joint disease ("DJD"). Dr. Boxerman place Plaintiff on naproxen and advised him to follow up with Dr. Evans. (Tr. 315)

Plaintiff presented to the ER for complaints of back pain on July 23, 2011. He was told to continue prescribed medications and was discharged. (Tr. 339-45) An x-ray of Plaintiff's cervical spine taken on August 4, 2011 revealed normal alignment; mild C4-C5 disc space narrowing; no vertebral body height loss; no abnormal motion; and uncovertebral joint hypertrophy that moderately narrowed the left C3-C4, C4-C5, and C5-C6 neural foramina. Upon examination, Plaintiff was in no acute distress with an appropriate affect. Plaintiff had decreased extension and turning his head due to pain. He also had neck pain with moving his chin to the left and right. Plaintiff's gait was steady, and the cervical spine was non-tender to palpation. Prudence Baugher, P.A., prescribed physical therapy and home exercises. (Tr. 352-55) Plaintiff attended two physical therapy sessions and was discharged due to non-compliance. (Tr. 377-83)

Plaintiff continued to see Dr. Evans for neck and back pain, as well as depression. On August 23, 2011, Plaintiff saw Dr. Evans to request epidural injections. Neck examination showed reasonable range of motion. Dr. Evans set up an epidural and advised Plaintiff to return in four months. If Plaintiff saw no improvement, Dr. Evans would refer Plaintiff to an orthopedist. (Tr. 364) Plaintiff saw Dr. Evans on October 25, 2011 for complaints of depression, diabetes, hyperlipidemia, hypertension, and back pain. His mood and sugars were good. His back still bothered him, but a recent epidural helped. Plaintiff requested more Vicodin. On examination, Plaintiff's mood and affect were normal. His back showed no tenderness to palpation. Plaintiff had positive straight leg raise on the right, negative on the left,

7

and his gait was antalgic. Plaintiff mentioned that he was out of work and trying to find a new job. Dr. Evans recommended weight loss and gave him sixty Vicodin with five refills. (Tr. 499-500)

Plaintiff underwent a mental health evaluation on November 4, 2011 at the request of family services because Plaintiff was applying for Medicaid. Ted Oliver, MSW, LCSW, assessed Depressive Disorder, NOS; Obesity; Diabetes Mellitus; Hyperlipidemia; Hypertension; Back and neck pain; Headaches; and Arthritis. Social stressors were limited access to health care, unemployment, and limited social supports. Mr. Oliver assessed a current global assessment of functioning ("GAF") of 53. (Tr. 441-42)

Plaintiff returned to Dr. Evans on November 30, 2011 for complaints of neck pain with cervical radiculopathy. Examination of the neck showed limited extension, reasonable axial range of motion, and good flexion. Dr. Evans set Plaintiff up for epidurals. On December 14, 2011, Plaintiff complained of a history of sleep apnea and requested a C-Pap. Otherwise he was doing fine. Dr. Evans set him up for a sleep study. After the sleep study, Plaintiff returned to Dr. Evans on December 29, 2011. Plaintiff also complained of knee pain. Dr. Evans noted that that Plaintiff's knees showed crepitation with range of motion. He assessed mild sleep apnea and opined that weight loss was the best treatment. In addition, Dr. Evans assessed osteoarthritis of the knees and restless leg syndrome. He prescribed Tramadol and Requip. On February 17, 2012, Plaintiff reported that he planned to have bariatric surgery. In addition, he complained of knee pain and requested an injection. Dr. Evans noted that Plaintiff's mood and affect were normal. His back showed no tenderness to palpation. He had positive straight leg raise on the right, negative on the left, and his gait was antalgic. Dr. Evans administered an injection in Plaintiff's left knee and provided information on bariatric surgery. (Tr. 501-05)

8

On May 2, 2012, Dr. Robert Jackson, a rheumatologist, evaluated Plaintiff for complaints of chronic back pain and arthritis pain, especially in the knees. Musculoskeletal exam revealed 12/18 positive fibromyalgia trigger points. Plaintiff had no localized synovitis, joint deformities, or restriction of joint range of motion. He exhibited mild parapatellar crepitus of both knees without joint effusions or baker cyst formation. His ankles showed no edema. Dr. Jackson's impressions were fibromyalgia complicated by morbid obesity, depression, and sleep apnea; and probable early arthritis of the weight bearing joints of lower back, hips, and knees. He encouraged Plaintiff to proceed with bariatric surgery and follow up in 8 to 12 weeks. (Tr. 506-07)

Plaintiff underwent bariatric gastric bypass surgery on May 9, 2012 and was discharged on May 12, 2012. (Tr. 462-74) He was hospitalized for complaints of neck and abdominal pain on May 12, 2012 after he was in a car accident following discharge. He was treated and discharged the same day in stable condition. (Tr. 414-39) On May 18, 2012, Plaintiff presented for a follow up appointment to remove the staples from his surgery. Plaintiff reported that his depression was well controlled. His joint and back pain had not changed since the surgery. (Tr. 477-80)

Plaintiff returned to Dr. Jackson on July 5, 2012 for a 2 month check. Plaintiff reported doing well with Tramadol. He complained of universal pain, mostly in his low back and lower extremities. Dr. Jackson noted 18/18 positive fibromyalgia trigger points. There was no edema in the ankles, and Plaintiff showed no clubbing, cyanosis, rheumatoid, or gouty nodules. Dr. Jackson assessed osteoarthritis of weight bearing joints and fibromyalgia. (Tr. 508-09) A follow up appointment with Dr. Jackson revealed improved diffuse fibromyalgia and new onset of left sciatica. He prescribed Savella. (Tr. 513-14)

9

On August 6, 2012, Plaintiff reported feeling like an old man during a follow up appointment with Dr. Evans. He complained of back pain, neck stiffness and soreness, left ankle pain, left knee pain, and occasional hip pain. He was otherwise doing well. Examination showed full active range of motion in the neck with some limitation of extension. Plaintiff had some mild arthritic changes in the left knee, hip, and ankle that were symmetrical with the right. He ambulated without difficulty. X-rays showed degenerative changes but were otherwise normal. Dr. Evans recommended Tramadol, weight loss, and exercise. (Tr. 511-12)

Plaintiff returned to Dr. Evans on October 11, 2012, complaining of depression, headaches, and insomnia. He reported that the Celexa no longer worked. Plaintiff's mood and affect were normal. Dr. Evans prescribed Venlafaxine for depression and Clonazepam for insomnia. (Tr. 516-17)

Dr. Chad M. Ronholm, a rheumatologist, examined Plaintiff on October 24, 2012. Plaintiff reported that the Savella initially helped with fibromyalgia pain but was not as effective. Tramadol provided mild to moderate relief. Musculoskeletal exam showed no synovitis but significant crepitus of the bilateral knees. Plaintiff had generalized muscle tenderness and 14/18 positive trigger points. Strength was 5/5 in all extremities. Dr. Ronholm assessed generalized osteoarthritis, fibromyalgia syndrome, and cervical radiculopathy. He increased the Savella and continued Plaintiff on Tramadol. He also showed Plaintiff some at home exercises and administered injections to the bilateral knees. (Tr. 519-21)

Plaintiff complained of migraine headaches on November 8, 2012. He reported to Dr. Evans that his mood was good on medication and that he had no trouble with side effects. He was pleased with his weight loss. Dr. Evans continued Plaintiff on his medication regimen and prescribed Topamax for headaches. (Tr. 522-24)

10

During subsequent visits with Dr. Ronholm, Plaintiff complained of worsening pain in his knees, neck, shoulders, and back. Dr. Ronholm noted fibromyalgia trigger points, mild disk space narrowing at the C-6 to C-7 level, crepitus of the knees, tenderness to palpation in the cervical and thoracic spine, pain in neck and shoulders with flexion and extension, pain with lateral rotation of the cervical spine, and decreased range of motion with rotation of the neck and cervical spine. Dr. Ronholm changed Plaintiff's medications, recommended corticosteroid injections, and encouraged Plaintiff to exercise. (Tr. 525-33; 575-78)

Plaintiff saw Carrie E. Danner, MSW, LCSW on January 31, 2103 for depression and anxiety. Ms. Danner assessed major depression, severe; PTSD, rule out generalized anxiety and mood disorder; back pain, headaches, blood sugar problems, and osteoarthritis identified by Plaintiff; and a GAF of 58. Plaintiff returned to Ms. Danner on February 20, 2013and received the same diagnoses. Plaintiff's wife called on February 25, 2013 to notify Ms. Danner that Plaintiff was in the hospital for attempted suicide. On March 7, 2013, Plaintiff stated that he was hospitalized on February 23, 2013 after experiencing crying episodes and feeling sad, lonely, and empty. He cut his arm and his wife took him to the ER. Plaintiff reported feeling significantly better since being discharged. Ms. Danner discussed coping mechanisms and educated Plaintiff on anxiety. (Tr. 553-70)

Plaintiff underwent an MRI of the cervical spine on March 5, 2013, which indicated left asymmetric uncovertebral spurring with significant left foraminal stenosis from C3-4 through C5-6. An MRI of the thoracic spine showed small scattered disk protrusion, including one at T7-8 just abutting the ventral cord. (Tr. 569-72) On March 7, 2013, Dr. Ronholm noted Plaintiff's MRI results and referred him to an orthopedic spine specialist. (Tr. 582) Also on March 7,

11

2013, Plaintiff saw Ms. Danner for a follow up after his psychiatric hospitalization. Ms. Danner suggested coping mechanisms for Plaintiff's anxiety. (Tr. 565-66)

On March 12, 2013, Dr. Craig A. Kuhns evaluated Plaintiff for upper back and neck pain, as well as limited movement in his neck. Physical examination revealed positive Spurling's to the left side which reproduced pain in the upper left cervical and mid cervical spine. The pain did not radiate down his arm, and Dr. Kuhns was relieved with Plaintiff's other range of motion. His sensation and strength were intact. Plaintiff appeared appropriate psychologically. Based on Plaintiff's severe foraminal stenosis and incapacitating symptoms, Plaintiff opted for surgical treatment. Dr. Kuhns scheduled a C3-4, 4-5, and 506 left-sided laminoforaminotomy. Dr. Kuhns did not believe Plaintiff would be normal but hoped he would be better. In addition, Dr. Kuhns noted that Plaintiff could be worse after the surgery. (Tr. 624-26)

Plaintiff underwent an initial psychosocial history evaluation at Preferred Family Healthcare on March 19, 2013. He complained of anxiety, nervousness, headaches, and depression. Mental status exam revealed mildly depressed mood and appropriate affect. Plaintiff's insight and judgment were adequate. Lyle Clark, M.D., diagnosed bipolar II disorder, depressed; social phobia, generalized type; PTSD, chronic; alcohol dependence, without physiologic dependence, in sustained full remission; and a Global Assessment Functioning ("GAF") score of 38. He decreased Plaintiff's Effexor prescription and began Zoloft. Plaintiff was to return in 3 weeks. (Tr. 589-623)

On April 1, 2013, Plaintiff was admitted to the hospital for a left-sided laminoforaminotomy. He was discharged the next day in stable and improved condition. Occupational Therapy notes indicated that Plaintiff was ambulating in the hallway with no need

of an ambulation device. Plaintiff and his wife identified no physical therapy needs and noted that the family would assist Plaintiff. (Tr. 634-45)

Plaintiff saw Carrie Danner on April 17, 2013 for a family counseling session, which focused on decreasing Plaintiff's PTSD symptoms. Plaintiff reported less anxiety and irritability, as well as better sleep, since he was hospitalized. Plaintiff returned to Ms. Danner on May 8, 2013, and they spent the session on the goal of decreasing depression symptoms. Plaintiff continued working on these goals in counseling sessions on May 15, 2013, May 29, 2013 and July 18, 2013. (Tr. 559-64, 668-69, 674-75, 683-84) On May 13, 2013, Plaintiff saw Dr. Evans for complaints of pain in his neck and trapezius. Plaintiff requested pain medication, and Dr. Evans gave him 60 Vicodin. (Tr. 666)

On May 16, 2013, Plaintiff presented for a follow up examination 6 weeks status post-surgery. Plaintiff reported relief of the neck pain he experienced prior to surgery. However, he had new symptoms including left upper extremity numbness, tingling, pain, and weakness. He also experienced numbness on the soles of his feet. In addition, Plaintiff stated his left shoulder was bothering him, with popping and pain when lifting his arm and difficulty twisting that arm. Examination revealed that Plaintiff was non-tender to palpation over the cervical spine. His flexion and extension were limited by pain. Upper extremity motor strength was 5/5 on the right but showed some limitation of 3-4/5 on the left. Laura Lisa Billings, AHCNS noted that Plaintiff had not experienced the relief they wanted, which had been an initial concern. In addition, he developed new upper extremity symptoms. Nurse Billings ordered a C7-T1 epidural steroid injection to address the pain. In addition, she referred Plaintiff to another doctor for a shoulder evaluation and scheduled an MRI. The MRI conducted on May 21, 2013 showed C3-4, C4-5,

13

C5-6, and C6-7 variable up to moderate to severe left foraminal stenosis secondary to asymmetric degenerative disease and T3-4 disc herniation. (Tr. 647-52)

On May 20, 2013, Plaintiff returned to Dr. Ronholm for a 3 month checkup. Plaintiff complained that he felt worse since his neck surgery. He walked for exercise but began feeling left hip pain with excessive walking. Musculoskeletal exam revealed no synovitis. He had generalized tenderness to palpation virtually everywhere, with 18 of 18 trigger points. In addition, Plaintiff had significant crepitus of the bilateral knees and decreased flexion, extension, and rotation of the neck due to pain and stiffness. Dr. Ronholm assessed osteoarthritis with degenerative disk disease as well as left foraminal stenosis from C3 to C4 and C5 to C6 and fibromyalgia syndrome. Dr. Ronholm continued medications and encouraged Plaintiff to participate in routine exercises for this pain. Plaintiff indicated that he was waiting for approval from insurance to begin physical therapy. (Tr. 671-73)

Plaintiff saw Dr. Seth L. Sherman on June 4, 2013 for complaints of left upper extremity pain and numbness. Dr. Sherman observed that Plaintiff was in no apparent distress. Examination of the right upper extremity was normal, and his left upper extremity revealed some periscapular pain on the left side through a shoulder motion arc. Dr. Sherman noted that the left shoulder exam was essentially normal. He opined that the pain was related to his surgery and recovery, and he sent Plaintiff back to Dr. Kuhns for further evaluation. Dr. Sherman showed Plaintiff a gentle home exercise program for his shoulder. (Tr. 653-56)

On that same date, Plaintiff saw Nurse Billings for a follow up exam 8 weeks status post-surgery. Nurse Billings noted that the exam by Dr. Sherman and the most recent MRI did not provide a good reason for Plaintiff's symptoms. She believed the symptoms were a normal part of healing but mentioned the possibility of a future referral to neurology for an EMG study if the

14

problems did not resolve in one month. Plaintiff also complained of back pain. Nurse Billings gave him books with exercises for neck and back strengthening. (Tr. 657-58)

Plaintiff returned to Dr. Ronholm on July 17, 2013 for complaints of bilateral hip pain and left knee pain. Plaintiff reported fatigue and some difficulty sleeping. He was trying to walk for exercise, as well as perform home back exercises. Examination revealed general tenderness virtually everywhere with 18 of 18 trigger points. He had significant crepitus of bilateral knees and decreased flexion, extension, and rotation of the neck due to pain and stiffness. Dr. Ronholm assessed osteoarthritis with degenerative disk disease as well as left foraminal stenosis from C3 to C4 and C5 to C6 and fibromyalgia syndrome. Dr. Ronholm administered an injection in Plaintiff's left knee and recommended that Plaintiff obtain an EMG and nerve conduction study of both the lower and upper extremities due to radiculopathy symptoms. (Tr. 679-82)

## IV. The ALJ's Determination

In a decision dated June 20, 2013, the ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2016. He had not engaged in substantial gainful activity since May 14, 2011, the alleged onset date. The ALJ determined that Plaintiff had the following severe impairments: osteoarthritis; fibromyalgia; depression; posttraumatic stress disorder; anxiety; history of cervical surgery; and degenerative joint disease of the knees. However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 10-14)

After carefully considering the entire record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a range of sedentary work as defined in 20 C.F.R.

15

404.1567(a). The ALJ specified that Plaintiff had only a limited range of motion of the neck and could perform only low-stress work, defined as no work with the public and no strict high-production demands. The ALJ reasoned that the RFC was supported by some of Plaintiff's subjective allegations, his extensive activities of daily living, the treatment notes and objective medical findings, and the record as a whole. The ALJ further round that Plaintiff was unable to perform any past relevant work. However, given his younger age, limited education, work experience, and RFC, the ALJ determined that jobs existed in significant numbers in the national economy which Plaintiff could perform. These jobs included sedentary hand assembler and sedentary machine tender, as set forth by the VE. Therefore, the ALJ concluded that Plaintiff had not been under a disability, as defined by the Social Security Act, from May 14, 2011 through the date of the decision. (Tr. 14-24)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. The Social Security Act defines disability "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe physical or mental impairment or combination of impairments which meets the duration requirement; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R.,

16

Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. *Id.*

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance, but sufficient evidence that a reasonable person would find adequate to support the decision." *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010). "We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because we might have reached a different conclusion had we been the initial finder of fact." *Buckner v. Astrue,* 646 F.3d 549, 556 (8th Cir. 2011) (citations and internal quotations omitted). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment. *Johnson v. Chater*, 108 F.3d 942, 944 (8th Cir. 1997) (citations and internal quotations omitted).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and

17

set forth the inconsistencies in the record. *Marciniak v. Shalala*, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. *Id.*

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the *Polaski*[1] factors and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount the testimony as not credible. *Blakeman v. Astrue*, 509 F.3d 878, 879 (8th Cir. 2007) (citation omitted). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. *Marciniak*, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises four arguments in his Brief in Support of the Complaint.[2] First, Plaintiff claims that the ALJ failed to properly assess the Plaintiff's RFC. Second, the Plaintiff argues that the ALJ failed to comply with the Commissioner's policies in evaluating the severity of Plaintiff's fibromyalgia. Third, Plaintiff contends that the ALJ erred in failing to mention Plaintiff's ongoing obesity and its effects on Plaintiff's RFC. Finally, Plaintiff asserts that the

---

[1]  The Eight Circuit Court of Appeals "has long required an ALJ to consider the following factors when evaluating a claimant's credibility: '(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.'" *Buckner*, 646 F.3d at 558 (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)).
[2]  The Court advises Plaintiff's attorney that the brief is not in compliance with E.D. Mo. L.R. 2.01 which requires filings, unless otherwise permitted by leave of Court, to be double spaced typed. Further, in future pleadings before this Court, counsel shall use 12 point font instead of the 10 point font utilized in the present brief, which renders the brief both difficult to read and in excess of the 20 pages counsel requested leave to file.

ALJ's credibility determination is patently erroneous. The Defendant responds that the ALJ properly analyzed Plaintiff's credibility and assessed his RFC in finding that Plaintiff could perform other work. Thus, the Defendant asserts that substantial evidence supports the ALJ's determination.

## A. Plaintiff's Credibility

Plaintiff argues that the ALJ failed to properly assess Plaintiff's credibility by mischaracterizing the evidence and discounting Plaintiff's allegations of disabling pain. Plaintiff requests that the Court remand the case to allow the ALJ to evaluate Plaintiff's credibility under the requirements of Social Security Ruling ("SSR") 96-7.

SSR 96-7p provides that when making credibility determinations with respect to a claimant's statements, the ALJ must "consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." The ALJ may not discredit the statements solely because they are unsubstantiated by objective medical evidence, and the ALJ's decision must give specific reasons for the credibility findings. SSR 96-7p; *Wiese v. Astrue,* 552 F.3d 728, 733 (8th Cir. 2009) ("an ALJ may not discount a claimant's subjective complaints solely because the objective medical evidence does not fully support them."). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart,* 354 F.3d 710, 714 (8th Cir.2003).

Here, contrary to Plaintiff's argument, the ALJ explicitly cited specific reasons for discounting Plaintiff's credibility. First, the ALJ thoroughly considered Plaintiff's subjective

19

complaints and testimony. (Tr. 15) The ALJ also considered Plaintiff's daily activities, which included reading, watching TV, caring for his sons, driving, visiting his parents, paying bills, preparing simple meals, and helping around the house when able. (Tr. 22) These activities are inconsistent with claims of disability. *See Ponder v. Colvin*, 770 F.3d 1190, 1195 (8th Cir. 2014) (finding plaintiff's activity level undermined her allegations of total disability where she performed light housework, washed dishes, could handle money, shopped, watched TV, drove a vehicle, regularly attended church, and visited with her family).

Plaintiff takes particular issue with the ALJ's consideration of third-party reports. Plaintiff argues that the ALJ should have given full consideration to the statements by Plaintiff's wife, mother, and mother-in-law because they were consistent with Plaintiff's testimony and the medical evidence. However, the record shows that the ALJ thoroughly considered all of these statements. (Tr. 22-23) Although SSR 96–7p mandates that an ALJ consider the testimony of "other persons," an ALJ is free to reject cumulative testimony of lay persons where the ALJ properly discredits the plaintiff's complaints of disabling pain. *Black v. Apfel,* 143 F.3d 383, 387 (8th Cir.1998). Here, Plaintiff's family members were not qualified to give an opinion regarding Plaintiff's ability to work, and the third-party reports merely corroborated Plaintiff's testimony regarding his activities and symptoms. Indeed, the ALJ explicitly found that the family members were not acceptable medical sources and that their opinions were inconsistent with the record and not supported by the evidence. *See Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996) (finding the ALJ properly refused to give controlling weight to testimony by plaintiff's mother, sister, and husband because they were not qualified to render an opinion regarding plaintiff's capacity to work, the statements merely corroborated plaintiff's testimony, and the testimony conflicted with the medical evidence); *see also Perkins v. Astrue*, 648 F.3d 892, 901 (8th Cir.

20

2011) (finding substantial evidence in the record supported ALJ's conclusion that the statements of plaintiff's family members were not entirely credible because they were inconsistent with the record as a whole and likely influenced by their affections for plaintiff).

Further, Plaintiff calls the ALJ's credibility determination "warped" because the ALJ relied on Plaintiff's job search to find Plaintiff's subjective complaints were not fully credible. Contrary to Plaintiff's assertion, the ALJ may discount a plaintiff's testimony where the plaintiff continues to look for work after his alleged disability date. *Farmer v. Colvin*, No. 4:11CV1947, 2013 WL 1197058, at *23 (E.D. Mo. Mar. 25, 2013) (citations omitted).

The ALJ also noted that the medical records did not support Plaintiff's allegations of disability. For instance, Plaintiff had no muscular atrophy or spasms, and he did not use an assistive device to ambulate. (Tr. 21-22) "The ALJ's observations about the absence of any reference in the medical records to a loss of muscle tone or to atrophy is relevant." *O'Brien v. Astrue*, No. , 2007 WL 2226032, at *16 (E.D. Mo. Aug. 1, 2007) (citation omitted); *see also Ramirez v. Barnhart*, 292 F.3d 576, 579, 582 (8th Cir. 2002) (relying on physical exam with essentially normal results and no muscle atrophy to discount plaintiff's allegations of disabling pain).

With regard to Plaintiff's allegations of persistent neck pain after surgery and new symptoms of arm numbness and tingling, the Court notes that records before the Appeals Council but not before the ALJ do show some continued complaints. However, the records also demonstrate that Plaintiff was in no apparent distress and that his symptoms were likely part of the healing process. (Tr. 653-56) Further, Plaintiff was advised to perform exercises to relieve the pain. Claims of disabling pain may be discounted by medical reports reflecting conservative treatment including neck exercises and physical therapy. *Jacobs v. Colvin*, No. 2:13-CV-30 CEJ,

2014 WL 942606, at \*11 (E.D. Mo. Mar. 11, 2014) (citation omitted). While Nurse Billings suggested the possibility of nerve conduction studies, both Nurse Billings and Dr. Sherman could not find any objective reason for Plaintiff's symptoms. (Tr. 648, 655)

Finally, contrary to Plaintiff's assertion, the ALJ did take into account Plaintiff's mental impairments. Indeed, the ALJ found that anxiety and depression further limited Plaintiff's RFC to low-stress work, defined as no work with the public, and no strict high-production demands. (Tr. 14) However, the ALJ also noted that Plaintiff's mental status exams were essentially normal. (Tr. 21) Further, Plaintiff's psychiatric hospitalization was due to situational stressors, and his symptoms improved with medication. Where a mental impairment is situational in nature and improves with mediation and counseling, the mental impairment is not disabling. *Gates v. Astrue*, 627 F.3d 1080, 1082-83 (8th Cir. 2010). In short, the Court finds that the ALJ properly evaluated Plaintiff's credibility and properly discredited Plaintiff's subjective complaints based upon the record as a whole.

## B. The RFC Determination

Plaintiff argues that the record does not contain any RFC assessments from physicians and, therefore, substantial evidence does not support the RFC determination. With regard to Plaintiff's residual functional capacity, "a disability claimant has the burden to establish [his] RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted). The ALJ determines a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of [his] limitations.'" *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 404.1545(a)(1).

22

The Court finds that substantial evidence supports the ALJ's RFC determination. First, as stated above, the ALJ performed a proper credibility analysis and discounted those allegations that were inconsistent with the record as whole. The ALJ then considered Plaintiff's credible allegations and the objective medical evidence to determine that Plaintiff's RFC for sedentary work was diminished by limitations to low-stress work and no strict high-production demands. (Tr. 14) The ALJ thoroughly assessed the medical evidence, including physical limitations contained in the treatment notes, and relied upon the treatment records and the objective findings of limitations to determine Plaintiff's RFC. Physicians noted that Plaintiff expressed he was doing fine and reported improvement with medication and injections. (Tr. 16-18) The ability to manage pain through medication and injections are inconsistent with allegations of disabling pain. *Moore v. Astrue*, 572 F.3d 520, 524-25 (8th Cir. 2009). Further, Plaintiff's strength was essentially normal, and he did not appear in distress during examinations. (Tr. 21)

While Plaintiff argues that the ALJ failed to obtain an assessment from a physician that supported the ALJ's RFC determination, the absence of an explicit reference to "work" in close proximity to a doctor's description of the plaintiff's medically evaluated restrictions "does not make it impossible for the ALJ to ascertain the [plaintiff's] work-related limitations from that evaluation; such explicit language is unnecessary where the medical evaluation describes the [plaintiff's] functional limitations 'with sufficient generalized clarity to allow for an understanding of how those limitation function in a work environment.'" *Wilkerson v. Astrue*, No. 1:10CV00188 AGF, 2012 WL 569942, at *5 (E.D. Mo. Feb. 22, 2012) (quoting *Cox v. Astrue*, 495 F.3d 614, 620 n.6 (8th Cir. 2007)). Indeed, the ALJ limited Plaintiff to sedentary work and considered Plaintiff's mental impairments, adding the further restrictions of low-stress work and no strict high-production demands.

In short, the evidence demonstrates that Plaintiff has some restrictions in his functioning and ability to perform work related activities; however, he failed to carry her burden to prove a more restrictive RFC determination. *Andrews v. Colvin*, No. 4:13-CV-1033-NAB, 2014 WL 2968815, at *3 (E.D. Mo. July 1, 2014). Thus, the Court finds that "[t]he ALJ thoroughly discussed the medical records before outlining his RFC determination, which [this Court] conclude[s] is supported by substantial evidence." *Gaston v. Astrue*, 276 F. App'x 536, 537 (8th Cir. 2008).

### C. Plaintiff's Fibromyalgia

Next, Plaintiff argues that the ALJ failed to properly evaluate the severity of Plaintiff's fibromyalgia. Plaintiff claims that the mere mention of Plaintiff's fibromyalgia diagnosis without consideration of the impact on his RFC is error.

The Court notes that while fibromyalgia has the potential to be a disabling disease, "[a] diagnosis of fibromyalgia alone is not sufficient to find that a claimant is disabled." *Reeves v. Colvin*, No. 2:14-CV-17 NAB, 2015 WL 75296, at *5 (E.D. Mo. Jan. 6, 2015) (citation omitted). Here, the ALJ noted the fibromyalgia diagnosis as well as the related symptoms as found by treating physicians, including generalized pain everywhere and 18 of 18 trigger points. (Tr. 16-19) The ALJ acknowledged that Plaintiff's complaints of pain were partially credible but that Plaintiff's symptoms improved with treatment and were not of the severity to preclude him from working. However, due to the pain from fibromyalgia and osteoarthritis, the ALJ limited Plaintiff to a range of sedentary jobs. (Tr. 19, 21-22) "'While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability.'" *Perkins v.*

24

*Astrue*, 648 F.3d 892, 900 (8th Cir. 2011) (quoting *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996)). Thus, the Court finds no error in the ALJ's assessment of Plaintiff's fibromyalgia.

## D. Plaintiff's Obesity

Finally, Plaintiff asserts that the ALJ failed to address Plaintiff's obesity and its effects on his RFC. The record belies Plaintiff's claim. The ALJ acknowledged Plaintiff's history of obesity, noting that Plaintiff's morbid obesity complicated his fibromyalgia. In addition, the ALJ noted that underwent gastric bypass surgery, resulting in significant weight loss. The ALJ found that Plaintiff's obesity was not severe; however he did make numerous references to Plaintiff's obesity and the results of Plaintiff's successful surgery when assessing Plaintiff's RFC. (Tr. 15-18) The Court finds that because the ALJ specifically took Plaintiff's obesity into account when evaluating Plaintiff's claim, the ALJ did not err in his RFC assessment. *See Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009) ("[W]hen an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal.").

Further, even if the ALJ erred by not finding Plaintiff's obesity to be severe, this error is harmless because the ALJ considered both the severe and non-severe impairments when determining Plaintiff's RFC. *See White v. Colvin*, No. 4:12CV2143 NCC, 2014 WL 4851823, at *15 (E.D. Mo. Sept. 29, 2014) (finding the ALJ's consideration of obesity was consistent with the regulations and case law where the ALJ found plaintiff's obesity to be non-severe because the ALJ considered factors relevant to obesity thought the decision). Thus, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social

security benefits is **AFFIRMED**. An appropriate Judgment shall accompany this Memorandum

and Order.

Dated this 7th day of March, 2016.

**RONNIE L. WHITE**
**UNITED STATES DISTRICT JUDGE**